AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  '25 MJ1278 |
| Black iPhone Seized as FP&F No. 2025565500013803 ("Target Device 3") | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling | |

The application is based on these facts:

See Attached Affidavit of Border Patrol Agent James T. Burns, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

U.S. Border Patrol Agent James T. Burns
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 03/19/2025 _____

_____
*Judge's signature*

City and state: San Diego, California        HON. VALERIE E. TORRES, U.S. Magistrate Judge
*Printed name and title*

1

## ATTACHMENT A-3

2

PROPERTY TO BE SEARCHED

3 The following property is to be searched:

4 Black iPhone
Seized as FP&F No. 2025565500013803
5 (**"Target Device 3"**)

6 **Target Device 3** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachment A-1, A-2, A-3, A-4, A-5, and A-6 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **February 23, 2025, through March 9, 2025**:

a.   tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b.   tending to identify accounts, facilities, storage Device, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate alien smuggling and transportation of smuggled aliens;

c.   tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.   tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.   tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

19

# AFFIDAVIT

I, James T. Burns, being duly sworn, hereby state as follows:

## INTRODUCTION

1.   I submit this affidavit in support of an application for a warrants to search the following electronic devices:

> Blue iPhone
> Seized as FP&F No. 2025565500013801
> (**"Target Device 1"**)

> Pink iPhone
> Seized as FP&F No. 2025565500013802
> (**"Target Device 2"**)

> Black iPhone
> Seized as FP&F No. 2025565500013803
> (**"Target Device 3"**)

> Gold iPhone
> Seized as FP&F No. 2025565500013804
> (**"Target Device 4"**)

> Black Samsung Phone
> Seized as FP&F No. 2025565500013805
> (**"Target Device 5"**)

> Purple OPPA Phone
> Seized as FP&F No. 2025565500013806
> (**"Target Device 6"**)

Collectively, the **Target Devices**, as further described in Attachment A-1, A-2, A-3, A-4, A-5, and A-6 to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

1

2.      The requested warrants relate to the investigation and prosecution of Javier MENCHACA Enriquez, Idai Jahir MADERA Diaz, Alexander Ian PEREZ, and John Michael QUIROZ, for transporting and moving Daniel DIAZ-Medina and Erik GUTIERREZ-Hernandez (the "Material Witnesses") within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter.   Dates and times are approximate.

## TRAINING AND EXPERIENCE

4.      I have been employed by the USBP since 2008 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for 16 years.  I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants.  I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.      My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and

2

harboring of illegal aliens into and within the United States; and the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6.      During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7.      Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California.  I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities.  Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.      The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens.  For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic

contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9.    Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10.    This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11.    On March 9, 2025, Border Patrol Agent E. Gonzalez was assigned to the Campo Station's Abatement Team (CSAT) within the Campo Border Patrol Station's area of responsibility (AOR). He was dressed in plain clothes with agency badge and insignia present on his body armor to identify himself as a law enforcement agent. Agent Gonzalez was operating an unmarked agency vehicle with operational emergency lights and sirens that allowed him to blend in with the surrounding community.

12.    At approximately 2:30 PM, while in the secondary inspection area of the checkpoint a citizen pulled into the secondary inspection area to advise Agent J. Wagner and other agents present that he had noticed suspicious behavior on Kitchen Creek Road involving a white pickup truck with a trailer attached, blue ATVs and several individuals. The area of

Kitchen Creek Road that was described is a common drop off point where alien smugglers drop off their human cargo to make their way up Kitchen Creek Road to Sunrise Highway where the illegal aliens are then picked up, this is a common route when attempting to circumvent the Interstate 8 Westbound Border Patrol Checkpoint. Agent Wagner drove his agency assigned Government Vehicle from the checkpoint to Sunrise Highway to investigate further and notified Agent Gonzalez via service radio that a possible smuggling vehicle was driving westbound along Sunrise Highway towards Interstate 8.

13.    Agent Gonzalez and Agent Wagner entered Interstate 8 and eventually located a white Ford F150 hauling a trailer with three all-terrain vehicles. Agent Wagner attempted a vehicle stop west of the Pine Valley bridges. The vehicle yielded but drove from the scene once both agents exited their vehicles. Agent Wagner notified dispatch of the failure to yield. The truck exited the Interstate at East Willows Road and came to a stop within the Viejas Outlet Store parking structure. Immediately after, everyone inside the truck exited and fled the scene on foot.

14.    Agent Gonzalez apprehended one subject, later identified as material witness Silvestre MIRANDA-Santiago, who was found within close proximately of the truck and relayed the direction of travel of the remaining individuals via service radio. Moments later, all other subjects were apprehended in various locations by responding agents.

15.    While at the station, Agent Gonzalez conducted an immigration inspection on Aaron BARBOZA, Idai Jahir MADERA-Diaz, Javier MENCHACA-Enriquez, Alexander Ian PEREZ, Johnmichael QUIROZ, Daniel DIAZ-Medina, Erik GUTIERREZ-Hernandez, Silvestre MIRANDA-Santiago, Antonio MONTANEZ-Casillas, and Genaro SANCHEZ-Flores.

16.    BARBOZA, DIAZ, ENRIQUEZ, PEREZ and QUIROZ stated they were United States citizens. MEDINA, HERNANDEZ, SANTIAGO, CASILLAS and FLORES stated they were citizens of Mexico without any immigration documents to be in or remain in the United States legally.

17.    At 6:00 p.m., BARBOZA, DIAZ, ENRIQUEZ, PEREZ and QUIROZ were placed under arrest for 8 USC 1324, alien smuggling. MEDINA, HERNANDEZ, SANTIAGO, CASILLAS and FLORES were placed under arrest for being in the United States illegally. This area is located approximately fourteen miles east of the Tecate, California Port of Entry and eight miles north of the international boundary between the United States and Mexico.

18.    At the time of arrest, **Target Device 1** was found on MENCHACA, **Target Device 2** was found on MADERA, **Target Device 3** was found on PEREZ, **Target Device 4** was found on QUIROZ, **Target Device 5** was found on DIAZ, and **Target Device 6** was found on GUTIERREZ. All **Target Devices** were subsequently seized.

19.    Defendant Javier MENCHACA Enriquez was read his Miranda Rights and stated he was willing to answer questions without the presence of an attorney. MENCHACA stated a friend told him about the job and convinced him to pickup illegal aliens. MENCHACA stated he thinks he picked up the aliens around Tecate, California. MENCHACA stated that QUIROZ, defendant John Michael QUIROZ, made the arrangements to pick up the aliens. MENCHACA stated that he didn't know any of the other United States Citizens in the vehicle with him or any of the aliens. MENCHACA stated that the three other individuals in the truck gave him directions and he drove around Viejas Casino for approximately an hour before heading east.

20.    MENCHACA stated that he failed to yield because the other United States Citizens told him to. MENCHACA stated that the gun found in the vehicle was registered to him out of the state of Nevada. MENCHACA stated he didn't have any intent to use it and had forgotten it was in his vehicle.

21.    Defendant John Michael QUIROZ was read his Miranda Rights and stated he was willing to answer questions without the presence of an attorney. QUIROZ stated that a high school friend made the arrangements with a smuggler to pick up the illegal aliens. QUIROZ stated that he was to be paid approximately $800 USD to smuggle five illegal aliens.

7

QUIROZ stated that his friend picked him up in the Las Vegas, Nevada area. QUIROZ stated that they met with the smuggling coordinator who placed an air token in the vehicle. QUIROZ stated he didn't know the driver of the pickup truck. QUIROZ stated that the illegal aliens were picked up near the border on three different ATV's. QUIROZ stated that the ATV's were driven by him and Alexander PEREZ. QUIROZ stated that the ATV's belong to the smuggling coordinator.

22.    QUIROZ stated that the gun found in the vehicle belonged to the driver of the truck. QUIROZ stated that when the driver failed to yield to Border Patrol, he wanted to exit the vehicle, but the driver pulled the gun on everybody and said no one is getting out. QUIROZ stated that the last two Sundays, they did the same pickup in the same location with the same route.

23.    Defendant Alexander PEREZ was read his Miranda Rights and stated that he was willing to answer questions without the presence of an attorney. PEREZ said that his friend John Michael QUIROZ invited him to ride ATVs in San Diego on March 3, 2025. PEREZ said that he, QUIROZ, and Javier MENCHACA Enriquez drove nonstop from Orange County to San Diego. PEREZ said that MENCHACA claimed to know a place to ride ATVs. PEREZ said that while riding, MENCHACA saw some people that needed a ride and that he thought these people were MENCHACA's family. PEREZ stated that these people entered the vehicle and sat in the backseat with him. PEREZ stated that MENCHACA knew that these people were aliens and that they were heading to Los Angeles. PEREZ stated that he knew MENCHACA had a gun and that he kept it in his pocket. PEREZ stated that MENCHACA had a child lock on the door and that he opened the door from the outside when the bail out occurred.

24.    Defendant Idai MADERA Diaz was read his Miranda Rights and stated that he was willing to answer questions without an attorney present. MADERA stated that Javier MENCHACA Enriquez was the owner of the vehicle used to smuggle aliens and that he convinced MENCHACA to drive to San Diego to pick them up. MADERA stated that he

had been in contact with an alien smuggling coordinator who helped make the arrangements. MADERA stated that he and MENCHACA drove from Las Vegas to pick up a trailer and two ATVs.

25.    MADERA stated that while waiting in the area, three masked subjects approached them and said that they were going with them. MADERA stated that the masked subjects guided them to another location to pick up a third ATV. MADERA stated that they stopped at the Viejas Casino to stretch their legs. MADERA stated that they drove down a road to pick up aliens and that the three masked subjects drove down another trail to pick up aliens. MADERA stated that they waited until the masked subjects told them to drive to Kitchen Creek. MADERA stated that when they arrived to Kitchen Creek the masked subjects unhooked the ATVs and carried them over the Forestry gate. MADERA stated that he and the masked subjects drove the aliens on the ATVs to Sunrise Highway while the truck drove back through the checkpoint with two U.S citizens and two aliens. MADERA stated that another vehicle was supposed to show up to assist them but never arrived.

26.    Material witnesses Daniel DIAZ Medina, Erik GUTIERREZ-Hernandez and Silvestre MIRANDA Santiago stated that they are citizens of a country other than the United States without the proper documents allowing them to enter or remain in the United States legally. DIAZ, GUTIERREZ, and MIRANDA stated that smuggling arrangements were made prior to crossing into the United States. DIAZ, GUTIERREZ, and MIRANDA stated that they were being charge a smuggling fee between $9,000 and $10,000 USD if successfully smuggled into the United States. DIAZ and MIRANDA stated they were instructed to lay down in the back of the pickup truck while other individuals got on top of them. MIRANDA positively identified MADERA as one of the individuals driving a motorcycle.

27.    Based upon my experience and training, consultation with other law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital

information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant and Material Witness were using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendants, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **February 23, 2025, through March 9, 2025.**

### METHODOLOGY

28.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the devices are subscribed, and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the

results using digital photography. This process is time and labor intensive and may take weeks or longer.

29.     Following the issuance of these warrants, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

30.     Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

31.     Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

## CONCLUSION

32.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Sections 1324.

33.     Because the **Target Devices** was seized at the time of the defendants and material witnesses arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **February 23, 2025, through March 9, 2025.**

//

34.    Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A-1, A-2, A-3, A-4, A-5, and A-6 to seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.


_____
James T. Burns
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 19th day of March 2025.


HON. VALERIE E. TORRES
United States Magistrate Judge